Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark H. Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mjensen@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RYAN SCHAVRIEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TAYLOR MADE GOLF COMPANY, INC.,<br><br>Defendant. | Case No.: '26CV6317 WQHBJW<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Ryan Schavrien ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Defendant Taylor Made Golf Company, Inc. ("Defendant" or "Taylor Made"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. The unauthorized collection and disclosure of a person's browsing activity, website interactions, personal identifiers, and device identifiers implicates the most basic expectation of privacy in one's online life. The misconduct is especially egregious where, as here, a company affirmatively represents to users that they may control whether their data is sold, shared, or tracked, then secretly sells, shares, and tracks that data anyway.

2. Taylor Made owns and operates the website located at https://www.taylormadegolf.com (the "Website").[1] Taylor Made is a golf equipment and accessories manufacturer and retailer based in Carlsbad, California.[2]

3. Taylor Made's Website allows users to explore and purchase a wide range of golf equipment and accessories, including golf clubs, drivers, irons, putters, golf balls, bags, and apparel. Visitors can browse product specifications, compare different models, customize golf clubs, explore the latest collections and technologies, and access information about products designed to improve their golf performance.

4. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a cookie preferences interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

5. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies, including the Meta Pixel, Microsoft Universal Event Tracking ("UET"), Google Analytics, the Reddit Pixel, Google Ads, Google DoubleClick, the TikTok Pixel, the Pinterest Tag, Einstein API ("Einstein"), and the Bazaarvoice Pixel ("BV Pixel") (collectively, the "Tracking Tools") capable of transmitting users' data the

---

[1] *See Terms and Conditions*, TAYLOR MADE (last updated Mar. 10, 2025) https://www.taylormadegolf.com/shared-customer-service-customer-legal/terms-and-conditions.html?lang=en_US (last visited Nov. 3, 2026).

[2] *See Privacy Policy*, TAYLOR MADE (last updated Jan. 23, 2025) https://www.taylormadegolf.com/shared-customer-service-customer-legal/privacy.html?lang=en_US (last visited Nov. 3, 2026).

moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings. The Tracking Tools transmit users' data in real time to the advertising, social media, and analytics companies that designed and operate them, Meta Platforms, Inc. ("Meta" or "Facebook"), Microsoft, Google, Reddit, TikTok, Pinterest, Salesforce, and Bazaarvoice (collectively, the "Tracking Entities").

6. Moreover, users, including Plaintiff, were misled by Defendant's Privacy Banner and Cookie Settings. The Website purports to let users manage their cookie preferences through the Cookie Settings. Specifically, users may: (1) click the "Reject" button in the Privacy Banner to decline cookies; or (2) click "Cookie Settings" to access the Cookie Settings to review and manage their selections, toggle off individual categories of cookies, reject the sale or sharing of their personal information and click "Do Not Sell or Share My Personal Information." Yet even after users affirmatively reject all non-necessary cookies, the Website continues to deploy cookies from and share users' information with Salesforce and Bazaarvoice.

7. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data includes: webpages and products viewed or purchased; inferred interests, preferences, age, location, and other characteristics based on users' behavior and content engagement; personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers, often contained within "cookies," that enable recognition of users across sessions and websites on the internet utilizing the same Tracking Tools; personal identifiers that associate users with individual profiles; users' email addresses; and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information," and collection begins the moment a user arrives on the Website.

8. By misrepresenting both the effectiveness of its tracking consent mechanism and users' ability to decline consent, Defendant deprives users of any real control over their Sensitive Information and their privacy.

9. Accordingly, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code § 631 (illegal wiretapping); Article I, Section 1 of the California Constitution; and common law, including intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiff brings this action individually and on behalf of a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. §§ 2511(1)(a), 2520. This Court has supplemental jurisdiction over the non-federal claims in this action pursuant to 28 U.S.C. § 1367(a). This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

11. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in Carlsbad, California.

12. Venue is proper in this Court because Defendant's principal place of business in Carlsbad, California, is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. §§ 1391(b)(1)-(2).

## PARTIES

13. Plaintiff Ryan Schavrien is, and at all relevant times has been, a citizen of the State of California. Plaintiff accessed and used Defendant's Website while physically located in California. Plaintiff maintains an account with Facebook, and his account contains his identifying information, and he was logged into that account when he accessed the Website.

14. Taylor Made is a Delaware corporation with its principal place of business in Carlsbad, California. Defendant owns and operates the Website.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Experience on the Website

15. Plaintiff is a resident of California. Plaintiff accessed the Website, most recently in or around February 2026, while being present in California. Plaintiff does not have an account on the Website and has not made a purchase on the Website. Specifically, Plaintiff looked at various page sections on the Website while searching men's apparel and Plaintiff entered related search queries such as "golf pants" on the Website.

16. In connection with Plaintiff's visit to Defendant's Website, Plaintiff was presented with Defendant's Privacy Banner and selected "Reject." Plaintiff reasonably believed that, after declining all non-necessary cookies, and absent any affirmative consent to tracking technologies, Plaintiff's browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff's lack of consent to tracking, Defendant deployed Einstein and the BV Pixel, which intercepted, recorded, and transmitted Plaintiff's browsing activity, device identifiers, and related metadata to Salesforce (which operates Einstein) and Bazaarvoice (which operates the BV Pixel). The interception disclosed the substance of Plaintiff's communications with the Website, including the webpages Plaintiff viewed while browsing men's apparel and Plaintiff's search for "golf pants," together with identifiers and related metadata. Had Plaintiff known that Defendant would deploy Einstein and the BV Pixel and disclose Plaintiff's information to third parties despite Plaintiff's rejection of non-necessary cookies, Plaintiff would not have continued to use the Website.

### II. How Websites Function

17. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are also "run" in part on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

18. When a user navigates to a webpage, by entering a URL directly or clicking a hyperlink, that user's browser contacts a Domain Name System ("DNS") server, which translates the website's web address into a unique Internet Protocol ("IP") address.[3]

19. An IP address is "a unique address that identifies a device on the internet or a local network."[4]

20. When a user's browser navigates to a webpage, it sends an HTTP request for a specific URL (the "Request URL") to the server identified by that IP address.

21. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

22. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

23. Website owners and web developers write and manage the URLs for their websites.

24. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. The browser processes that code as it arrives and renders it into the visual display, according to the HTML's instructions, creating the visible, usually interactive, website most people think of.[5]

---

[3] *See How the Web Works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Nov. 4, 2026).

[4] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Nov. 4, 2026).

[5] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Nov. 4, 2026).

25. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[6]

26. Such code is used, among other things, to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

27. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

## III. Defendant Programmed the Website To Identify and Track Users

28. Defendant voluntarily integrated Tracking Tools from the Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both Defendant and the Tracking Entities.

29. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for or even hover over.

30. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party

---

[6] *See JavaScript: Adding Interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Nov. 4, 2026).

cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

31. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

32. As detailed further below, the Tracking Tools (and the first- and third-party cookies they use) that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

33. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

34. The Tracking Entities use the collected Sensitive Information from users, such as Plaintiff, to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

35. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

## IV. The Website Misrepresented That Users Could Control the Collection and Disclosure of Their Sensitive Information

36. Defendant displayed a Privacy Banner and Cookie Settings on the Website. The Privacy Banner and Cookie Settings represented that users could make material choices about what technologies were used on the Website and how their data was shared with third parties.

Plaintiff relied on these representations when using the Website. However, these representations were materially false and misleading.

37. When users visited the Website, the Website immediately displayed a Privacy Banner, stating: "We utilize cookies to tailor content and advertisements, offer social media functionalities, and analyze traffic on our website. Additionally, we share details regarding your site usage with our social media, advertising, and analytics associates. They may integrate this information with other data you have supplied to them or that they have gathered from your utilization of their services."[7] The Privacy Banner provided users with options to click "Allow," "Reject," or "Cookie Settings" to manage their cookie preferences.




*Figure 1 – The Website's Privacy Banner representing that users could change the Website's tracking behavior*

38. After users clicked the "Reject" button, the Privacy Banner disappeared from view.[8]

---

[7] *See Pacific Luxe Hoodie*, TAYLOR MADE, https://www.taylormadegolf.com/Pacific-Luxe-Hoodie/L1243714.html?lang=en_US (last visited Nov. 4, 2026).

[8] *See id.*

39. Website users who selected the "Cookie Settings" option were presented with the Cookie Settings, which represented that users could control how their Sensitive Information was collected and shared. The Cookie Settings allow users to toggle off "Functionality," "Performance," and "Targeting" categories of cookies, and to toggle on "Do Not Sell or Share My Personal Information." Users can then click "Allow Selection" or "Close."




*Figure 2 – The Website's Cookie Settings, representing that users could change the Website's tracking behavior*

40. The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiff, and would reasonably lead all Website users similarly situated, to believe that they had disabled all but strictly necessary cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiff and all reasonable users to believe that Defendant would not share or sell their Sensitive Information with the Tracking Entities or any other third parties. Plaintiff acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of Plaintiff's personal information and use of any Tracking Tools other than necessary cookies.

41. However, Defendant did not abide by Plaintiff's expressed preferences and does not abide by users' expressed preferences. When users click "Reject" or reject individual

categories of cookies and the sale or sharing of their personal information, they clearly communicate that they do not consent to the placement or transmission of cookies other than those that are strictly necessary. Nevertheless, Defendant continued to cause Einstein and the BV Pixel, including cookies, to be placed or otherwise accessed on users' browsers and devices after users rejected cookies so that Salesforce and Bazaarvoice could intercept, transmit, and use users' Sensitive Information in real time.

## V. Defendant's Website Uses Tracking Tools

42. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information in real time as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

43. Generally, the Tracking Tools function by intercepting users' communications, including Plaintiff's Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, view a product, or load any page on the Website.

44. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiff, when they visit the Website, including users who never made an account or purchase on the Website. The cookies allow the Tracking Entities to identify users, including Plaintiff, when they visit the Website or any other website where the Tracking Tools are present.

45. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiff's Sensitive Information. Defendant uses Plaintiff's Sensitive Information to improve its marketing and advertising, while the Tracking Entities use Plaintiff's Sensitive Information for marketing and advertising on the Website and other third-party websites, improve their own services, including enhancing the algorithms used to build their Tracking Tools, and to build personal profiles to advertise to users, including Plaintiff.

**VI. The Meta Pixel**

46. Facebook offers its own tracking pixel known as the Facebook or Meta Pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

47. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel and then add code to the website to make use of the Meta Pixel.[9]

48. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[10] This Pixel ID initializes the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID or by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[11]

49. This Pixel ID must match a known Pixel ID in Meta's system, and is transmitted by the Meta Pixel.[12]

50. As Facebook notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[13]

51. Defendant places the Meta Pixel on the Website to gather, collect, and then transmit user information to Facebook.[14] Defendant and Facebook use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns,

---

[9] *See Setup and Install the Meta Pixel*, META, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Nov. 4, 2026).

[10] *See id.*

[11] *See Get Started with the Meta Pixel*, FACEBOOK (updated June 30, 2026) https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Nov. 4, 2026).

[12] *See id.*

[13] *See id.* ("To install the Pixel, we highly recommend that you add its base code…on every page where you will be tracking website visitor actions.").

[14] *See id.* The Meta Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and to share a tracked user's data with Facebook. *See Specifications for Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Nov. 4, 2026).

enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[15] Defendant directly benefits from the use of the Meta Pixel by using these profiles for advertising.

52. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[16]

53. Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

54. When a Facebook user logs onto Facebook, tracking cookies, including the "c_user" cookie, the "datr" cookie, and the "fr" cookie, are automatically created and stored on the user's device.[17] These cookies allow Facebook to link the data it receives through the Meta Pixel to individual Facebook users.

55. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.




*Figure 3 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Meta Pixel*

56. The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from *Figure 3* to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook profile associated with the FID, as depicted below:

---

[15] *See Meta Pixel*, META (last updated Nov. 15, 2023) https://developers.facebook.com/docs/meta-pixel/ (last visited Nov. 4, 2026).

[16] *See Meta Advantage+ Audience: Target Ad Campaigns with AI*, META, https://www.facebook.com/business/ads/meta-advantage-plus/audience (last visited Nov. 4, 2026).

[17] *See Cookies Policy: What Are Cookies, and What Does This Policy Cover?*, META (Dec. 12, 2023) https://www.facebook.com/policy/cookies/ (last visited Nov. 4, 2026).




*Figure 4 – Sample Facebook account created by Plaintiff's counsel to investigate the Meta Pixel, with FID highlighted in URL*

57. The Meta Pixel tracks user activity on web pages by monitoring events,[18] which, when triggered, cause the Pixel to automatically send data, users' Sensitive Information, directly to Facebook.[19] Examples of events utilized by websites include a user loading a page with a Pixel installed (the "PageView event") and a user clicking a button on a page (the

---

[18] *See About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Nov. 4, 2026).

[19] *See id.*

"SubscribedButtonClick" event) (collectively, the "Pixel Events").[20] The Website utilizes the Pixel Events.[21]

58. The Meta Pixel also transmits Defendant's unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "1482191385409805" for the purpose of matching the harvested data to Defendant's Website.

59. Facebook independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Facebook benefits from intercepting and analyzing users' Sensitive Information by refining its marketing algorithms and improving the effectiveness of its ad sales to all advertisers through Meta's social media platforms to target Meta's users, profiting from the ability to more accurately target potential customers.

60. Meta admits that it shares users' Sensitive Information with third parties,[22] just as Plaintiff's Sensitive Information was shared here.

61. Defendant's use of the Meta Pixel on the Website is demonstrated by the screenshots below:

---

[20] *See Specifications for Meta Pixel Standard Events*, *supra* note 14.

[21] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About Meta Ads Data Advisor*, META, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Nov. 4, 2026).

[22] *See Privacy Policy*, META (July 23, 2026) https://www.facebook.com/privacy/policy?section_id=4-HowDoWeShare (last visited Nov. 4, 2026).




*Figure 5 – Meta Pixel tracking a user through the "PageView" event*




*Figure 6 – Contents intercepted by the Meta Pixel when it captures a user's communications on the Website through the "PageView" event*




*Figure 7 – Cookies transmitted by the Meta Pixel on the Website through the "PageView" event*




*Figure 8 – Meta Pixel tracking a user through the "SubscribedButtonClick" event*




*Figure 9 – Contents intercepted by the Meta Pixel when it captures a user's communications on the Website through the "SubscribedButtonClick" event*




*Figure 10 – Cookies transmitted by the Meta Pixel on the Website through the "SubscribedButtonClick" event*




*Figure 11 – Meta Pixel tracking a user through the "AddToCart" event*




*Figure 12 – Contents intercepted by the Meta Pixel when it captures a user's communications on the Website through the "AddToCart" event*




*Figure 13 – Cookies transmitted by the Meta Pixel on the Website through the "AddToCart" event*

62. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[23] Plaintiff and Website users, however, are not provided this information and would have no reason to look for it, as they are not parties to Defendant's agreement with Facebook.

63. To make use of the Meta Pixel, Defendant agreed to Meta's Business Tools Terms (the "Meta Terms").

64. The Meta Terms inform website owners using the Meta Pixel that the employment of the Meta Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[24]

---

[23] *See Get Started with the Meta Pixel*, *supra* note 11. (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data.… By default, the Pixel will track URLs visited [and] domains visited.").

[24] *See Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025) https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Nov. 4, 2026).

65. The Meta Terms are transparent that Meta will use the Pixel Event information and contact information "to match the Contact Information against user IDs… as well as to combine those user IDs with corresponding [Pixel Event information]."[25]

66. Facebook directs parties implementing the Meta Pixel, here, Defendant, to encrypt request information before data can be shared.[26]

67. Facebook further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Facebook.

68. Facebook educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[27]

69. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

## VII. Microsoft UET

70. Microsoft offers Microsoft Advertising (formerly known as "Bing Ads"), a platform where advertisers can display ads to consumers across the internet based on their search terms and interests.[28]

71. One of the software tools available through Microsoft Advertising is UET, which allows website owners, like Defendant, to allow Microsoft to track conversion events on a

---

[25] *Id.*

[26] *See id.*

[27] *See Privacy and Data Use Requirements for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Nov. 4, 2026).

[28] *See Bing Ads API Overview*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/?view=bingads-13 (last visited Nov. 4, 2026).

website, target specific audiences, and automate advertisement bidding. Defendant uses the information collected by UET to maximize the performance of the advertising on the Website.[29]

72. UET is a tag that is placed on a website. Once UET is installed, the tag reports all users' activity on the website to Microsoft Advertising.[30]

73. UET uses several cookies, which it stores and/or accesses on website visitors' browsers. These cookies include the MR cookie, the MUID cookie, which contains a globally unique ID assigned to a visitor's browser that identifies them,[31] the _uetsid cookie, which contains a session ID, and the _uetvid cookie, which contains a unique ID for a unique website visitor.[32]

74. UET can collect a vast amount of data from website visitors. The MUID/GUID cookie and the visitor's IP address are always passed to Microsoft with every HTTP request from UET. UET can also collect:

- Event categories
- Event actions
- Event types
- Browser language setting
- Page URLs
- Referrer URLs
- Screen height
- Session ID
- The UET tag ID
- A signed-in user's ID

---

[29] *See What Is UET and How Can It Help Me?*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/56681/2 (last visited Nov. 4, 2026).
[30] *See id.*
[31] *See Cookies*, MICROSOFT, https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-cookies (last visited Nov. 4, 2026).
[32] *See FAQ: Universal Event Tracking*, MICROSOFT, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500 (last visited Nov. 4, 2026).

- A visitor ID[33]

75. Information collected by Microsoft UET is used to build custom audiences. Audiences are created by segmenting users by personal characteristics and interests. Advertisers like Defendant then use these groups to improve and target their advertising.[34]

76. These audiences can be shared between advertisers that use Microsoft UET, allowing advertisers to track users between websites across the internet.

77. Microsoft uses the data collected by Microsoft UET for its own purposes. Microsoft claims ownership over all information collected by its customers and uses it to deliver Microsoft Advertising and improve its own services.[35]

78. Defendant's use of UET on the Website is shown in the figures below:




*Figure 14 – UET tracking users' communications on the Website*

---

[33] *See id.*

[34] *See Universal Event Tracking*, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking?view=bingads-13 (last visited Nov. 4, 2026).

[35] *See Microsoft Advertising Agreement*, MICROSOFT, https://help.ads.microsoft.com/Resources/Microsoft_Advertising_Agreement_Online_Terms_v.2026-09-01/en-us.pdf (last visited Nov. 4, 2026).




*Figure 15 – Content intercepted by UET tracking users' communications on the Website*




*Figure 16 – Cookies transmitted by UET on the Website*

## VIII. Google Analytics

79. Defendant embeds Google Analytics in its Website to enable Google to intercept users' Sensitive Information.

80. Google Analytics ("GA") invisibly collects data about user interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.

81. Google admits that it shares users' Sensitive Information with third parties,[36] just as Plaintiff's Sensitive Information was shared here.

82. The data collected through GA is sent back to Google, which associates the activity with the website from which it was collected. Notably, Google notifies web developers that they should provide users with "clear and comprehensive information about . . . the storing and

[36] *See Privacy & Terms*, GOOGLE, https://policies.google.com/privacy?hl=en#infosharing (last visited Nov. 4, 2026).

accessing of cookies or other information on the User's device where such activity occurs in connection with the Service and where providing such information and obtaining such consent is required by law."[37]

83. In short, the use of GA involves specific data-collection practices, preconfigured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing users and obtaining any required consent onto website operators like Defendant.

84. Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating its Website as a property; (3) adding a data stream to determine what information to collect; and (4) adding GA to its Website.

85. Defendant's use of GA on the Website is shown in the screenshots below:




*Figure 17 – Google Analytics capturing a user's communications with the Website*

[37] *Google Analytics Terms of Service*, GOOGLE (last updated May 15, 2023) https://marketingplatform.google.com/about/analytics/terms/us/ (last visited Nov. 4, 2026).




*Figure 18 – Content intercepted by Google Analytics capturing a user's communications with the Website*




*Figure 19 – Cookies transmitted by Google Analytics on the Website*

86. Google provides analysis and feedback, which helps Defendant monetize the collected information through targeted advertising.

87. On December 18, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[38]

88. "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a particular device and user," explained Stephen Almond, executive director of regulatory risk at the Information Commissioner's Office ("ICO").[39]

89. Digital fingerprinting essentially creates a unique digital ID for a user and their device based on various pieces of information collected when users browse the internet, including a user's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari,

---

[38] *See* Pieter Arntz, *Google Now Allows Digital Fingerprinting of Its Users*, MALWAREBYTES (Feb. 19, 2025) https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Nov. 4, 2026).

[39] Stephen Almond, *Our Response to Google's Policy Change on Fingerprinting*, INFORMATION COMMISSIONER'S OFFICE (Dec. 19, 2024) https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Nov. 4, 2026).

Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[40]

90. In addition to device identifiers, fingerprinting collects all the websites and apps the user uses, creating a detailed map for Google to follow and analyze, enabling a profile to be built of everything a consumer likes and is likely to buy.[41]

91. Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts user choice and is wrong."[42]

92. In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect users' privacy, providing few specifics about how PETs do so.[43]

93. The ICO finds fingerprinting an unfair means of tracking users online, "because it is likely to reduce people's choice and control over how their information is collected."[44]

94. The ICO explains:

> [W]hen you choose an option on a consent banner or "clear all site data" in your browser, you are generally controlling the use of cookies and other traditional forms of local storage. Fingerprinting, however, relies on signals that you cannot easily wipe. So, even if you "clear all site data", the organization using fingerprinting techniques could immediately identify you again.[45]

---

[40] *See* Arntz, *supra* note 38.

[41] *See* Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks and It Will Track Your Devices*, FORBES (last updated Jan. 8, 2025, 12:21 PM) https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Nov. 4, 2026); *see also* Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (last updated Feb. 18, 2025, 12:54 AM) https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Nov. 4, 2026).

[42] Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, *supra* 41.

[43] *See id.*

[44] *See* Almond, *supra* note 39.

[45] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks and It Will Track Your Devices*, *supra* note 41.

95. As a result of Defendant's use of Google's GA tool, users, including Plaintiff, lost control of their Sensitive Information and had marketing profiles developed through the use of their Sensitive Information, allowing Google and Defendant to benefit.

## IX. The Reddit Pixel

96. Defendant has installed a tracking pixel on its Website created by social media platform Reddit (the "Reddit Pixel").

97. The Reddit Pixel is a piece of code that can be added to a website by a website owner to allow Reddit to track users on the website and record the actions the visitors take from users' browsers.[46] The harvested data is subsequently used by Reddit and the website owner to serve targeted ads to website users on Reddit.

98. The Reddit Pixel is also used in conjunction with Reddit's Conversion API ("CAPI") to track specific actions that users take on the websites, such as viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[47]

99. Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser,[48] and to specify "which business account should receive" the user's tracking data.[49]

100. Reddit admits that it shares users' Sensitive Information with third parties,[50] just as Plaintiff's Sensitive Information was shared here.

---

[46] *See About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Nov. 4, 2026).

[47] *See Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Nov. 4, 2026).

[48] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Nov. 4, 2026).

[49] *About the Reddit Pixel*, *supra* note 46.

[50] *See Reddit Privacy Policy*, REDDIT (last updated May 26, 2026) https://www.reddit.com/policies/privacy-policy (last visited Nov. 4, 2026).

101. In Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id" which identifies Defendant's Reddit Pixel ID as "a2_gkb5mrhla20l". This data is sent both when receiving communications from the Website and as users send communications to the Website.

102. Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

103. Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a user and sends that email information to Reddit.[51]

104. In addition to email addresses, a website owner can enable the Reddit Pixel and the CAPI to send additional personal information to Reddit, known as "match keys," to identify website users.[52]

105. IP addresses are match keys that website owners are required to send to Reddit. Website owners and Reddit may also use other match keys, including:

- Phone numbers;
- Email addresses;
- Mobile Advertising IDs (a unique identifier for a mobile user);
- Reddit Click IDs (to attribute click conversions more accurately);
- External IDs (an advertiser-assigned identifier that enhances match accuracy);
- Reddit UUIDs (a unique ID generated by the Reddit Pixel);
- User Agents (which identify the software the user is using to access the website); and
- The visitor's screen dimensions.[53]

---

[51] *See Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Nov. 4, 2026).

[52] *See About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Nov. 4, 2026).

[53] *See id.*

106. This data can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on the website.

107. Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific campaigns, track users across devices, and create more precisely targeted campaigns.[54]

108. Additionally, Reddit employs this data to optimize its own ad placements and to develop new services.[55]

109. Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below:




*Figure 20 – Reddit Pixel tracking a user through the "PageVisit" event*

---

[54] *See id.*

[55] *See Reddit Privacy Policy*, *supra* note 50.




*Figure 21 – Payload of Reddit Pixel capturing a user's communications with the Website*




*Figure 22 – Cookies of Reddit Pixel capturing a user's communications with the Website*

110. To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

111. The Reddit Terms inform website owners, such as Defendant, that the employment of the Reddit Pixel will result in Reddit obtaining users' data, including users' website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[56]

112. The Reddit Terms explicitly condition the use of the Reddit Pixel on website owners' warranties that they: (i) "prominently disclose to and obtain any legally required consent from users" that their information "may be shared with and used by third parties"; (ii) provide "clear, prominent, and legally sufficient instructions regarding how to opt out of such data collection and use[;]" and (iii) do not share "any data related to users who have not provided consent."[57]

113. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

## X. Google Ads

114. Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[58]

115. The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the

---

[56] *Reddit Business Tool Terms*, REDDIT (last updated July 7, 2025) https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Nov. 4, 2026).
[57] *Id.*
[58] *See Set Marketing Campaign Goals for Your Business*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Nov. 4, 2026).

website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results; (iii) Google then allows advertisers to bid on those various keywords; (iv) the advertiser with the best Ad rank wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.[59]

116. Google Ads intercepted users' Website activity, as depicted below. Plaintiff's experience aligns with this depiction. This interception occurred through users' browsers as communications were sent and/or received on users' devices.




*Figure 23 – Google Ads capturing a user's communications with the Website*

---

[59] *See How to Set Up Google Ads: A Checklist*, GOOGLE ADS (last updated Mar. 2023) https://business.google.com/us/resources/articles/how-to-setup-google-ads-a-checklist/ (last visited Nov. 4, 2026).




*Figure 24 – Content intercepted by Google Ads capturing a user's communications with the Website*




*Figure 25 – Cookies transmitted by Google Ads on the Website*

117. Google uses the NID cookie to identify users on the Website.[60] This allows Google to match the intercepted communications with a specific user.

## XI. Google DoubleClick

118. DoubleClick for Publishers ("DoubleClick"), now known as Google Ad Manager,[61] allows advertisers and/or website owners to connect with other website owners and buy ad space within other websites, and allows website owners to track the performance of their

[60] *See Privacy & Terms: How Google Uses Cookies*, GOOGLE, https://policies.google.com/technologies/cookies?hl=en-US (last visited Nov. 4, 2026).

[61] *See* Brock Munro, *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (last updated Oct. 8, 2026) https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited Nov. 4, 2026) ("While [DoubleClick for Publishers ("DFP")] was rebranded as Google Ad Manager (GAM) several years ago, it is often still referred to as DFP within the ad tech industry.").

ads across websites.[62] DoubleClick "acts as a liaison between a [website owner's] ad inventory, relevant ad networks," and website owners that are "looking to purchase ad space on a website."[63]

119. DoubleClick works in a similar way to Google Ads and Google AdSense in that it allows companies to buy impressions through the DoubleClick Ad Exchange.[64] A DoubleClick account requires the use of a corresponding Google AdSense account.[65]

120. The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[66] (ii) a third-party advertiser then creates an ad campaign using Google Ads, which includes ad creatives, targeting options, and bid strategies; (iii) the advertiser then submits the ad to DoubleClick where it is reviewed and approved; (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.

121. AdSense ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Defendant, receive a percentage of the revenue recognized by Google.

122. The bidding system is similar to the Google Ads system. The benefits provided to Google from DoubleClick are also similar to those provided by Google's search ads. Google Ad Manager has various fee structures that can be utilized including a percentage of spend plus a flat monthly fee; a flat monthly fee or percentage of spend, whichever is higher or a flat fee percentage based on the amount you spend every month. Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

---

[62] *See* Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP BY GENIEE (Dec. 10, 2022) https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited Nov. 4, 2026)

[63] Munro, *supra* note 61.

[64] *See The DoubleClick Ad Exchange*, GOOGLE, https://static.googleusercontent.com/media/www.google.com/en//adexchange/AdExchangeOverview.pdf (last visited Nov. 4, 2026).

[65] *See* Grover, *supra* note 62.

[66] *See* Munro, *supra* note 61.

123. Defendant sends users' page views to Google via the URL googleads.g.doubleclick.net as depicted below:



*Figure 26 – Google DoubleClick capturing a user's communications with the Website*




*Figure 27 – Content intercepted by Google DoubleClick capturing a user's communications with the Website*




*Figure 28 – Cookies transmitted by Google DoubleClick on the Website*

124. The DSID cookie is used by Google to link individual users with advertising and analytic events.[67] This allows Google to link the intercepted communications with specific users.

## XII. The TikTok Pixel

125. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across a website (the "TikTok Pixel").

126. The TikTok Pixel is a snippet of code that begins to collect information the moment a user lands on the Website. To use the TikTok Pixel, the website operators, including Defendant, must include the specific pixel IDs associated with their websites, which allows TikTok to link the intercepted data back to their individual TikTok business profiles.[68]

127. Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in Figures 30 and 32. The TikTok JavaScript code in *Figure 30* references

---

[67] *See* D.J. Leith, *Cookies, Identifiers and Other Data That Google Silently Stores on Android Handsets*, 165 COMPUTS. & SEC. 104850, 6 (2026).

[68] *See generally Troubleshoot with Pixel Helper*, TIKTOK (last updated Feb. 2025) https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en (last visited Nov. 4, 2026) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

Defendant's Pixel ID, and the "code" variable in Figure 32 identifies the TikTok Pixel ID; both reference the Pixel ID as "CMO5MJBC77UEANSKG6B0".

128. TikTok Pixel users make use of events to collect even more specific data on users' activities, including actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[69]

129. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

130. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of a user);

c. Device information, including make, model, operating system, and browser information;

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[70]

131. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are, which webpages users have visited, and how they interact with the Website.

132. TikTok's "Advanced Matching" feature allows Defendant to "match customer information such as email, phone number, and other identifiers with actions people take on [the

---

[69] *See generally About TikTok Pixel*, TIKTOK (last updated June 2026) https://ads.tiktok.com/resources/help/article/tiktok-pixel?lang=en (last visited Nov. 4, 2026); *Troubleshoot with Pixel Helper*, *supra* note 68.

[70] *See About TikTok Pixel*, *supra* note 69.

Website]."[71] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[72] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[73] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[74]

133. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to identify users and develop their marketing profiles, improving Defendant's conversion rates and reducing overall advertising costs.[75]

134. Defendant used the TikTok Pixel to monitor and log, in real time from users' browsers, when users clicked on specific products, loaded webpages and added specific products to cart, and proceeded through the checkout process to payment and shipping.

135. The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users[76]).

---

[71] *About Advanced Matching for Web*, TIKTOK (last updated Sept. 2025) https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Nov. 4, 2026).
[72] *How to Set Up Automatic Advanced Matching*, TIKTOK (last updated Nov. 2025) https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Nov. 4, 2026).
[73] *See Get Started with the TikTok Pixel: A Small Business Guide*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Nov. 4, 2026) (benefits of using the TikTok Pixel).
[74] *See* Lizzie Davey, *How to Use TikTok Pixel: TikTok Conversions Tracking*, LEADSBRIDGE (May 2, 2025) https://leadsbridge.com/blog/tiktok-pixel/ (last visited Nov. 4, 2026).
[75] *See id.*
[76] *See List of Cookies*, G-STAR RAW 13 (March 2023) https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Nov. 4, 2026).

136. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and create and access vast amounts of data to run successful ad campaigns.[77]

137. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services, including the sale of targeted advertising, and to generate its own benchmarking reports to share with other TikTok business customers.[78]

138. In fact, TikTok admits that it gathers Website visitors' Sensitive Information via the TikTok Pixel and shares that Sensitive Information with third or fourth parties,[79] just as Plaintiff's Sensitive Information was gathered and shared here.

139. According to a leading data security firm, the TikTok Pixel installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately link[s] to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[80] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "often before users have a chance to accept cookies or otherwise grant consent."[81]

140. An image of the invasive TikTok code embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

[77] *See Get Started with the TikTok Pixel: A Small Business Guide*, *supra* note 73.
[78] *See TikTok Business Products (Data) Terms*, TIKTOK (last updated Jan. 22, 2026) http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Nov. 4, 2026).
[79] *See Privacy Policy*, TIKTOK (last updated July 15, 2026) https://www.tiktok.com/legal/page/us/privacy-policy/en (last visited Nov. 4, 2026).
[80] Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023, 1:59 PM) https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Nov. 4, 2026).
[81] *Id.*




*Figure 29 – Using a browser's "developer tools" while visiting Defendant's webpage confirms the Website loading TikTok Pixel's code onto the user's browser, which caused the transmission of an HTTP Request to TikTok's servers*




*Figure 30 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website, including Advanced Matching and AutoAdvancedMatching*

141. The TikTok Pixel instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show the webpage code Defendant causes to run on users' browsers, and the electronic impulses sent to TikTok from users' browsers to aid TikTok's building of marketing profiles on users:




*Figure 31 – TikTok Pixel tracking a user through the "Pageview" event*




*Figure 32 – Contents intercepted by the TikTok Pixel when it captures a user's communications on the Website through the "Pageview" event*




*Figure 33 – Cookies transmitted by the TikTok Pixel on the Website through the "Pageview" event*




*Figure 34 – TikTok Pixel tracking a user through the "AddToCart" event*




*Figure 35 – Contents intercepted by the TikTok Pixel when it captures a user's communications on the Website through the "AddToCart" event*



*Figure 36 – Cookies transmitted by the TikTok Pixel on the Website through the "AddToCart" event*

142. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). But Plaintiff and other Website visitors are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiff and Website visitors.

143. The TikTok Terms inform website owners using TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[82]

[82] *See TikTok Business Products (Data) Terms*, *supra* note 78.

144. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[83]

145. TikTok puts TikTok Pixel users, such as Defendant, on notice that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[84] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

146. TikTok educates and reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[85]

147. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their private information.

## XIII. The Pinterest Tag

148. Defendant installed a tracking pixel on its Website created by the social media site, Pinterest (the "Pinterest Tag").

149. The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take in order to later target these visitors with ads on Pinterest.[86]

---

[83] *See id.*
[84] *Id.*
[85] *Id.*
[86] *See Install the Pinterest Tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Nov. 4, 2026).

150. To make use of the Pinterest Tag, a website owner must include its Pinterest tag ID in its base code.[87]

151. The Pinterest tag ID identifies which code needs to be sent to the user's browser to track website owner-designated data points through specified "events,"[88] and to establish which Pinterest account will receive the data upon collection.[89]

152. Once a website owner adds the base code of the Pinterest Tag, website owners can add "event codes" so the Pinterest Tag tracks specific actions that visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[90]

153. The Pinterest Tag begins intercepting user information as soon as the Pinterest Tag loads onto users' browsers.[91]

154. Website owners, like Defendant, then send the collected information to Pinterest. Pinterest recommends that website owners transmit website visitors' IP addresses for all conversion events.[92]

155. Without implementing any other features, the Pinterest Tag tracks and transmits the URL the website visitor is currently viewing. Additionally, the Pinterest Tag reads and uses

---

[87] *See Add the Base Code to Your Website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Nov. 4, 2026).

[88] *See Add Event Codes*, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Nov. 4, 2026).

[89] *See Add the Base Code to Your Website*, *supra* note 87; *see also Set Up the Pinterest Tag With Google Tag Manager*, PINTEREST, https://help.pinterest.com/en/business/article/google-tag-manager-and-pinterest-tag (highlighting that integrating Pinterest Tags with third-party data tracking systems requires a Pinterest tag ID to know which Pinterest conversion account should receive the tracked data) (last visited Nov. 4, 2026).

[90] *See Add Event Codes*, *supra* note 88.

[91] *See Track Conversions with Pinterest Tag*, PINTEREST, https://developers.pinterest.com/docs/track-conversions/pinterest-tag/ (last visited Nov. 4, 2026).

[92] *See Track Conversion Events in the API*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Nov. 4, 2026).

first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[93]

156. Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[94]

157. This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach."[95]

158. Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize return on ad spend, and broaden audience reach.[96]

159. The Pinterest Tag also sends the "tid" parameter, which identifies the website owner's Pinterest Tag ID.[97] Here, the "tid" parameter, found in Pinterest Tag transmissions from Defendant's site, contains Defendant's Pinterest tag ID of 2620345815039. This data is sent both when the Website receives communications and when users send communications to the Website.

160. Additionally, unless websites make use of a specific "Limited Data Processing flag," Pinterest employs this data, such as names, phone numbers, emails, and IP addresses, to conduct research on Pinterest usage and to market its own services.[98]

---

[93] *See View Tag Parameters and Cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Nov. 4, 2026).

[94] *See Enable Automatic Enhanced Match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Nov. 4, 2026).

[95] *Id.*

[96] *See id.*

[97] *See View Tag Parameters and Cookies*, PINTEREST, (last visited Nov. 4, 2026).

[98] *See Limited Data Processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Nov. 4, 2026).

161. Pinterest also sends the data to its business partners and other vendors.[99] Defendant's use of the Pinterest Tag on the Website is demonstrated below:




*Figure 37 – The Pinterest Tag capturing a user's communications with the Website*

---

[99] *See State Privacy Law Disclosures and Notice at Collection*, PINTEREST (last updated Apr. 2025) https://policy.pinterest.com/en/notice-at-collection (last visited Nov. 4, 2026).




*Figure 38 – Content intercepted by the Pinterest Tag capturing a user's communications with the Website*




*Figure 39 – Cookies transmitted by the Pinterest Tag on the Website*

162. When a website owner applies to Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service (the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[100]

163. The Pinterest Terms further provide Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

164. Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose their data practices and obtain their users' consent where required by law.[101]

165. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private Sensitive Information.

## XIV. Einstein

166. Salesforce is an agentic enterprise company that helps businesses grow by integrating all aspects of their business in a single platform. One of the software tools offered by Salesforce is Einstein, which is used to track shopper activity.[102]

167. Einstein collects data from users on a website, allowing Salesforce and the website to create a profile for each individual user and create personalized product recommendations for them.[103]

---

[100] *See Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Nov. 4, 2026).

[101] *See id.*

[102] *See Einstein Activities*, SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-activities?meta=Summary (last visited Nov. 4, 2026).

[103] *See Einstein Profile Connector*, SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-profile-connector?meta=Summary (last visited Nov. 4, 2026).

168. Einstein tracks and intercepts events on the Website, sending events such as viewProduct, viewReco, clickReco, and addToCart back to Salesforce.[104]

169. Einstein identifies users, and builds individual profiles for them, by associating them with unique ids. Users who visit a website are assigned a unique UUID cookie that associates them and their website communications with a personalized profile.[105]

170. Salesforce uses the individual profiles to decide whether to promote or recommend specific products to individual customers.[106] Defendant benefits from these profiles by improving its marketing.

171. Salesforce benefits from the Sensitive Information intercepted by Einstein by using the data "to train AI models" and "to develop new features" for all Einstein customers to use.[107]

172. Users who are not logged into a website are also assigned a unique cookieId and users who are logged into a website are assigned a userId, which are both set as first-party cookies.[108]

---

[104] *See Einstein Activity Uses*, SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/usage.html (last visited Nov. 4, 2026).

[105] *See UuidParam*, SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-profile-connector?meta=type%3AUuidParam (last visited Nov. 4, 2026).

[106] *See Configure Profile Data*, SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/configure-profile-data.html (last visited Nov. 4, 2026).

[107] *Einstein and Data Usage in B2B Commerce*, SALESFORCE, https://help.salesforce.com/s/articleView?id=commerce.admin_einstein_features_data_usage_commerce.htm&type=5 (last visited Nov. 4, 2026).

[108] *See Send Profile Data*, SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/send-profile-data.html (last visited Nov. 4, 2026).

173. Salesforce lists the "uuid" cookie, a "[t]hird-party version of the first-party __cq_uuid cookie set on .cquotient.com," among the cookies "[u]sed by Einstein for AI functionality."[109]

174. Salesforce warns website operators, such as Defendant, that they must "obtain explicit, specific authorization from the Customer for the use, processing, and/or storage of their data, and operate only within the scope of that authorization."[110]

175. Defendant has implemented Einstein on the Website and uses it to build personalized profiles for Website users.

176. Defendant's use of Einstein on the Website can be seen in the figures below:

[109] *Browser-Based Local Data Storage in B2C Commerce*, SALESFORCE, https://help.salesforce.com/s/articleView?id=cc.b2c_local_data_storage.htm&type=5 (last visited Nov. 4, 2026).

[110] *Salesforce APIs License and Terms of Service*, SALESFORCE (last updated July 20, 2026), https://www.salesforce.com/company/legal/sfdc-api-terms-of-service/ (last visited Nov. 4, 2026).




*Figure 40 – Einstein capturing a user's communications with the Website*




*Figure 41 – Content intercepted by Einstein capturing a user's communications with the Website*




*Figure 42 – Cookies transmitted by Einstein on the Website*

## XV. The Bazaarvoice Pixel

177. Defendant has also installed a pixel created by the ratings and review platform Bazaarvoice.

178. Bazaarvoice's main business is implementing review platforms on websites, allowing website owners to easily manage and track reviews for their products.[111]

179. However, Bazaarvoice also offers website owners Bazaarvoice Analytics integration, also known as the BV Pixel. The BV Pixel allows website owners to collect and monitor the behavior of users on their website.[112]

180. The BV Pixel can capture a variety of user events, such as when a user purchases a product, interacts with Bazaarvoice user reviews, or views a webpage containing Bazaarvoice content, such as a product page with reviews.[113]

181. The BV Pixel also intercepts personally identifiable information when the website owners configure it to do so. When a user triggers a transaction or conversion event, the BV Pixel can send the user's email address, locale, nickname, and "userId."[114]

182. Bazaarvoice also uses cookies to consistently track users when they visit a website. These cookies are first-party cookies, as the website places them, and allow Bazaarvoice to track and identify users.[115]

---

[111] *See About Bazaarvoice,* BAZAARVOICE, https://www.bazaarvoice.com/company/ (last visited Nov. 4, 2026).

[112] *See Analytics Providers*, BAZAARVOICE (updated Oct. 15, 2026) https://docs.bazaarvoice.com/articles/ratings-reviews/integrate-analytics (last visited Nov. 4, 2026).

[113] *See Introduction to BV Pixel*, BAZAARVOICE (updated Oct. 15, 2026) https://docs.bazaarvoice.com/articles/ratings-reviews/introduction-to-bv-pixel (last visited Nov. 4, 2026).

[114] *See id.*

[115] *See Bazaarvoice Cookies*, BAZAARVOICE (last updated Oct. 29, 2026) https://docs.bazaarvoice.com/articles/#!portal-basics/cookies/q/session/qp/1/qid/239076 (last visited Nov. 4, 2026).

183. Two cookies that are used by Bazaarvoice to track users are the BVBRANDID cookie, which persists for one year, and the BVBRANDSID cookie, which persists for the user's browsing session.[116]

184. Bazaarvoice warns website owners that "these cookies can only be set if the site visitor has given consent through a cookie consent panel on your website."[117]

185. Defendant's use of the BV Pixel on the Website can be seen in the figures below.




*Figure 43 – The BV Pixel capturing a user's communication on the Website*

[116] *See id.*

[117] *Id.*




*Figure 44 – Content intercepted by the BV Pixel capturing a user's communications with the Website*




*Figure 45 – The BV Pixel cookies capturing a user's communication on the Website*

186. These figures show that Defendant implemented the BV Pixel on the Website, which intercepted and transmitted the contents of users' communications with the Website, along with identifying cookies, to Bazaarvoice.

187. Defendant intentionally placed the Bazaarvoice identifying cookies on the Website, as shown in the figure below.




*Figure 46 – First-party cookies placed by Defendant on the Website, including the BV Pixel cookies*

188. Figure 46 shows the Website placing the BVBRANDID and BVBRANDSID first-party cookies, allowing Bazaarvoice to track individual users on the Website.

189. Bazaarvoice admits that it shares users' Sensitive Information with third parties,[118] just as Plaintiff's Sensitive Information was shared here.

---

[118] *See Privacy Policy*, BAZAARVOICE (last updated Feb. 14, 2024) https://www.bazaarvoice.com/legal/privacy-policy/ (last visited Nov. 4, 2026).

190. Bazaarvoice educates or reminds BV Pixel users of their obligation to be honest with their consumers and to "maintain a privacy policy that accurately reflects your use of the content received, retrieved, accessed, and transferred through the Bazaarvoice API."[119]

191. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the BV Pixel and ignored Bazaarvoice's instruction to warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

## XVI. The Tracking Tools Listed Above Intercepted and Disclosed Both the Contents of Plaintiff's Communications with the Website, as Well as Plaintiff's Personal Identifiers

192. Plaintiff had a reasonable expectation that the following information would not be exposed to the Tracking Tools placed by Defendant: (i) Plaintiff's identifying information, (ii) information that designated Plaintiff as interested in purchasing Defendant's products, and (iii) IP address and identifier information relating to who Plaintiff is, and who Plaintiff was communicating with.

193. When Plaintiff browsed men's apparel on the Website and searched for "golf pants," the Tracking Tools contemporaneously intercepted Plaintiff's communications, which is reflected and can be seen in the Request URLs. The path and query string of these Request URLs reflect the substance of a user's communication and therefore constitute content.

194. The Tracking Tools also intercepted and disclosed Plaintiff's and Defendant's IP addresses, Defendant's personal identifiers for each Tracking Tool, and the cookies that individually identified Plaintiff.

195. This interception, duplication, and transmission occurred inside Plaintiff's browser(s), before the communications fully reached Plaintiff's device, or before they were transmitted from Plaintiff's device. The Tracking Entities, which were third parties to Plaintiff's

---

[119] *API Terms of Use*, BAZAARVOICE (last updated Aug. 2026) https://www.bazaarvoice.com/legal/terms-of-use/api/ (last visited Nov. 4, 2026).

communications with Defendant, therefore intercepted, read, duplicated, and retransmitted the communications while they were in transit.

**XVII. Plaintiff Did Not Consent to Third-Party Tracking**

196. The Website's default settings permitted tracking to begin as soon as users arrived on the Website.

197. Even when Plaintiff rejected non-necessary cookies and the sale or sharing of Plaintiff's personal information, Einstein and the BV Pixel continued to intercept Plaintiff's communications and transmit identifiers after Plaintiff rejected cookies.

198. When Plaintiff rejected non-necessary cookies and the sale or sharing of Plaintiff's personal information, Plaintiff relied on Defendant's representation that no non-necessary cookies would be used and Plaintiff's personal information would not be shared with any third parties, including Salesforce and Bazaarvoice, and continued to browse and use the Website in reliance on that representation.

199. The figures below are exemplar images taken during counsel's investigation of the Website to show post-rejection tracking and cookies on the Website by an example browser. On information and belief, the Website's configuration of Einstein and the BV Pixel was materially the same during Plaintiff's February 2026 visit.




*Figure 47 – Evidence showing Einstein still intercepting user communications on the Website after cookies were rejected*




*Figure 48 – Contents intercepted by Einstein when it captures a user's communications on the Website after cookies were rejected*




*Figure 49 – Evidence showing Einstein still transmitting cookies on user's device after cookies were rejected*




*Figure 50 – Evidence showing the BV Pixel still intercepting user communications on the Website after cookies were rejected*




*Figure 51 – Contents intercepted by the BV Pixel when it captures a user's communications on the Website after cookies were rejected*

200. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members suffered actual damages, including the loss of control over their personal information and the diminution in value of that information.[120] Plaintiff's and the Class members' Sensitive Information has concrete economic value, as shown by the robust market in which such data is bought, sold, and licensed.[121] Through its Privacy Banner, Defendant represented that users could

---

[120] *See Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *14 (N.D. Cal. Dec. 22, 2021) (finding that "[p]laintiffs 'have suffered harm in the form of diminution of the value of their private and personally identifiable data and content'" through defendant's collection of plaintiffs' data); *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (concluding that "plaintiffs who suffered a loss of their personal information suffered economic injury" and had standing sufficient to satisfy statutory requirements of economic injury).

[121] *See* Order Denying Google's Mot. for Summ. J. at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot

decline non-essential tracking, thereby preserving the security and value of their Sensitive Information. Plaintiff relied on that representation and affirmatively declined. By facilitating Salesforce's and Bazaarvoice's interception, collection, and use of Plaintiff's Sensitive Information regardless of Plaintiff's affirmative rejection of all but strictly necessary cookies, Defendant took for itself and its partners the value of that information without consent or compensation. Defendant also stripped Plaintiff of the ability to decide whether, when, to whom, and on what terms Plaintiff's Sensitive Information would be shared and/or sold.

201. Plaintiff values the privacy and exclusivity of Plaintiff's Sensitive Information. It is plausible, and indeed likely, that Plaintiff would at some point have monetized Plaintiff's data by selling or licensing it through one of the many available channels.[122] Defendant's unauthorized dissemination has foreclosed or diminished that opportunity, because data that has already been captured and distributed to third parties without restriction commands a lower price, or no price at all, in that market. Plaintiff therefore lost the benefit of Plaintiff's bargain, lost the exclusive value of Plaintiff's Sensitive Information, and did not receive the privacy protections Defendant promised.

202. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[123] Because Defendant and its third-party partners have already obtained Plaintiff's information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiff.

---

program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb lets you sell your data to AI labs for training*, AXIOS (Aug. 6, 2026) https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (last visited Oct. 28, 2026) (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New wallet app lets users store their own training data*, AXIOS (Sept. 22, 2025) https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (last visited Oct. 28, 2026) (similar).

[122] *See* Mills, *supra* note 121; *see also* Morrone, *supra* note 122.

[123] *See* Mills, *supra* note 121; *see also* Morrone, *supra* note 122.

## TOLLING

203. The statutes of limitations applicable to Plaintiff's and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiff's and the Class members' delayed discovery of their claims. Defendant's acts were technically complex, and inherently self-concealing, thereby preventing Plaintiff and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

204. Defendant not only facilitated and enabled the covert incorporation of Tracking Entities' Tracking Tools into its Website, but also, via its Privacy Banner, misrepresented its data sharing practices.

205. Defendant possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its Website would disclose Plaintiff's and Class members' Sensitive Information in contradiction to Plaintiff's cookie settings preferences.

206. Plaintiff and the Class members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

207. Plaintiff first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint, on or about October 5, 2026.

## CLASS ALLEGATIONS

208. Plaintiff brings these claims for relief pursuant to the Federal Rule of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class and Subclass.

209. Plaintiff brings this class action individually and on behalf of the following Class:

> All persons who, while located in the United States, visited Defendant's Website during the applicable limitations period, and who interacted with the Website's Privacy Banner and/or Cookie Settings and rejected the Website's use of non-necessary cookies, and whose electronic communications were intercepted, disclosed, and/or transmitted to the Tracking Entities through Defendant's use of the Tracking Tools (the "Class").

210. Plaintiff brings this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited and interacted with Defendant's Website while located in the State of California during the applicable limitations period (the "California Subclass").

211. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

212. Plaintiff reserves the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

213. NUMEROSITY: At this time, Plaintiff does not know the number of Class members but believes the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impracticable. The exact identities of Class members may be ascertained via the records maintained by Defendant in the ordinary course of its business.

214. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties; and

e. Whether the Class members are entitled to injunctive relief.

215. TYPICALITY: As a person who visited Defendant's Website, rejected non-necessary cookies, and whose communications were nonetheless intercepted and transmitted to the Tracking Entities, Plaintiff is asserting claims that are typical of the Class members.

216. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

217. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE WIRETAP ACT
### 18 U.S.C. § 2510, et seq.
### (On Behalf of Plaintiff and the Class)

218. Plaintiff incorporates by reference and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein.

219. Plaintiff brings this cause of action individually and on behalf of all Class members.

220. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

221. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

222. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

223. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

224. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

225. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

226. Plaintiff, Defendant, and the Tracking Entities are "person[s]" within the meaning of the Wiretap Act.

227. The Tracking Tools, Plaintiff's devices and browsers, and Defendant's Website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

228. Plaintiff had a reasonable expectation of privacy in Plaintiff's electronic communications with Defendant's Website, including the pages Plaintiff viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject all sharing of their personal information and all non-necessary cookies.

229. Within the relevant time period, Plaintiff's electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted from Plaintiff's browser to the Tracking Entities without Plaintiff's consent, for the unlawful purpose of monetizing Plaintiff's intercepted information, including for combining that information with information collected about Plaintiff from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

230. Interception occurred whenever Plaintiff interacted with the Website, including when Plaintiff navigated webpages, viewed content, or otherwise communicated information to the Website through Plaintiff's browsers.

231. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

232. Plaintiff did not consent to the interception, recording, disclosure, or use of Plaintiff's electronic communications with the Website by the Tracking Entities. Instead, Plaintiff affirmatively declined cookies through Defendant's Privacy Banner.

233. The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. Defendant thereby procured the Tracking Entities to intercept Plaintiff's communications. *See* 18 U.S.C. § 2511(1)(a).

234. Defendant intentionally procured the Tracking Entities' interception of the contents of Plaintiff's and the Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state. Defendant engaged in such conduct for unlawful and tortious purposes, including invasion of privacy, and associating the content of Plaintiff's and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic

communications in a manner that exceeds what Defendant promised Plaintiff and the Class members on its Website.

235. Additionally, Plaintiff's communications were fraudulently disclosed via Defendant's implementation of the Tracking Tools on the Website, and were obtained and used based on misrepresentations Defendant made to Plaintiff through the Privacy Banner.

236. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

237. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by Plaintiff and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; appropriate equitable and declaratory relief; and

c. reasonable attorneys' fees and costs.

**COUNT II**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

238. Plaintiff incorporates by reference and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein.

239. Plaintiff brings this cause of action individually and on behalf of all California Subclass members.

240. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free

exercise of personal liberties." Cal. Penal Code § 630. CIPA extends civil liability for various means of surveillance using technology.

241. CIPA provides that an entity is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," said entity commits any of the following: (i) intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. *See* Cal. Penal Code §§ 631(a), 637.2(a).

242. The Website, the Tracking Tools, and Plaintiff's devices and browsers each qualify as a "machine, instrument, or contrivance, or… other manner" used to engage in the prohibited conduct at issue here. *See* Cal. Penal Code § 631(a).

243. Within the relevant time period, the Tracking Entities, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and the California Subclass members, contemporaneously with the communications' transit through or passing over any wire, line or cable or with the communications being sent from or being received at any place within California.

244. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

245. Plaintiff and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of Plaintiff's and the California Subclass members' respective rights to privacy.

246. As a direct and proximate result of Defendant's conduct, Plaintiff and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631. *See* Cal. Penal Code § 637.2(a).

**COUNT III**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. I, § 1**
**(On Behalf of Plaintiff and the California Subclass)**

247. Plaintiff incorporates by reference and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein.

248. Plaintiff brings this cause of action individually and on behalf of all California Subclass members.

249. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

250. California voters added the words "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, Assemblyman Kenneth Cory and State Senator George Moscone stated: "[t]he right of privacy is the right to be left alone…. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve

other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom."[124]

251. Plaintiff and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications.

252. Plaintiff's and California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of personal information."

253. The privacy rights of Plaintiff and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff and the California Subclass members.

254. Plaintiff and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Salesforce and Bazaarvoice despite users' selections, Defendant violated their reasonable expectation of privacy.

255. Defendant's intrusion, placing third-party Tracking Tools and enabling Salesforce and Bazaarvoice access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person and constitutes a serious invasion of privacy and an egregious breach of social norms.

---

[124] Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 11 27.

256. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff and the California Subclass members have been harmed and are entitled to compensatory damages, punitive damages, and injunctive relief.

**COUNT IV**
**COMMON LAW INVASION OF PRIVACY**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Class)**

257. Plaintiff incorporates by reference and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein.

258. Plaintiff brings this cause of action individually and on behalf of all Class members.

259. Defendant intruded upon the legally protected privacy interests of Plaintiff and the Class members by, among other things, permitting Tracking Tools to intercept and use users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

260. Plaintiff and Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information. Plaintiff expected that his interactions and communications with the Website would not be shared with third-party analytics providers without his consent and after his express rejection.[125]

261. Plaintiff and Class members relied on Defendant's representations and exercised the Website's controls, reasonably expecting that Defendant would honor its affirmative

[125] For example, the California Legislature enacted the California Consumer Privacy Act of 2018 (the "CCPA"), and Californians voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (the "CPRA"). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See* generally, Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

representation in the Privacy Banner and Cookie Settings that users could decline non-necessary cookies.

262. Despite Plaintiff's and the Class members' selections, Defendant permitted Salesforce and Bazaarvoice to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

263. Defendant lacked any legitimate business justification for permitting the placement and transmission of first- and third-party cookies and Tracking Tools that allowed Salesforce and Bazaarvoice to access, intercept, and collect users' Sensitive Information, contrary to users' express selections.

264. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

265. Plaintiff and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, punitive damages where available, and injunctive relief to prevent further unlawful tracking.

## COUNT V
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiff and the Class)

266. Plaintiff incorporates by reference and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein.

267. Plaintiff brings this cause of action individually and on behalf of all Class members.

268. Defendant made affirmative representations to users through its Privacy Banner, Cookie Settings, and related disclosures that users could decline all non-necessary cookies by selecting "Reject," or by selecting "Cookie Settings" and turning off the individual cookie toggles and clicking "Allow Selection."

269. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

270. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences. Plaintiff viewed the Privacy Banner and rejected cookies on the Website, most recently in or around February 2026.

271. These representations were false and misleading. After Plaintiff rejected cookies, Defendant deployed Einstein and the BV Pixel to intercept and collect Plaintiff's and the Class members' Sensitive Information and transmit the same to Salesforce and Bazaarvoice.

272. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools' functionality, which would have shown Defendant that information intake did not decrease after users declined non-necessary cookies, as it would have if the consent controls functioned as described.

273. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

274. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data through Einstein and the BV Pixel for its own commercial benefit.

275. Plaintiff and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the decline controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

276. Plaintiff's and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

277. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and the Class members suffered damages, including loss of privacy and loss of control over their personal information, and diminution in the value of their personal data. Plaintiff and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

278. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data through Einstein and the BV Pixel despite representing that such practices would cease upon declining.

279. Plaintiff and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, and punitive damages where available, and injunctive relief to prevent further misrepresentations.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

280. Plaintiff incorporates by reference and realleges paragraphs 1 through 217 of this Complaint as if fully set forth herein.

281. Plaintiff brings this cause of action individually and on behalf of all Class members.

282. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

283. It is unjust that Defendant retains those benefits under circumstances in which Einstein and the BV Pixel collected and transmitted the information in breach of the representations made to users and without valid consent.

284. Plaintiff and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at their expense. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and the Class members are entitled to the relief set forth below.

## PRAYER

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. An order certifying the class and making all appropriate class management orders;

b. For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and the California Subclass and Plaintiff's counsel as Class Counsel;

c. For an order declaring Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff, the Class, and the California Subclass, on all counts asserted herein;

e. Entry of an order for injunctive and declaratory relief, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f. An award of statutory damages or penalties to the extent available;

g. An award of punitive damages to the extent available;

h. For damages in amounts to be determined by the Court and/or jury;

i. For pre-judgment interest on all amounts awarded;

j. For an order of restitution and all other forms of monetary relief;

k. An award of all reasonable attorneys' fees and costs; and

l. Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: November 5, 2026

Respectfully submitted,

*/s/Jason M. Ingber*

Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark H. Jensen*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mjensen@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming